# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# FT. MYERS DIVISION

**UNITED STATES OF AMERICA,**

       **Plaintiff**

**-vs-**                                                                             **Case No. 2:05-cr-71-FtM-99DNF**

**ERICK PERRY,**

       **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This cause came on for consideration on the following motion filed herein:

| | |
|---|---|
| **MOTION:** | **MOTION TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS OF DEFENDANT (Doc. No. 725)** |
| **FILED:** | **October 31, 2006** |

**THEREON** it is **RECOMMENDED** that the motion be **DENIED**.

The Defendant, Erick Perry is requesting that the traffic stop be found to be unlawful and all evidence seized from the stop and statements made by the Defendants after the unlawful stop be suppressed. The Defendant is charged in a Second Superseding Indictment (Doc. 714) with conspiring with others to possess with intent to distribute 500 grams or more of a detectable amount of cocaine and to manufacture and distribute 50 grams or more of cocaine base in violation of 21 U.S.C. §§841(a)(1), 841(b)(1)(A)(iii), 841(b)(1)(B)(ii)(II), and 846. An evidentiary hearing was held on November 2, 2006.

**I. Testimony and Evidence**

The Government presented the testimony of City of Fort Myers Road Patrol Sergeant Michael Masiero, Florida Highway Patrol Trooper Joseph Gideons, and Florida Highway Patrol Sergeant Daniel Hinton. The Defendant introduced documentary evidence.

**A. Testimony of Sergeant Masiero**

Sergeant Masiero has been employed by the City of Fort Myers Police Department since 1994. (Tr[1]. p. 4). He has worked on road patrol, as a detective in narcotics, on the CLEAN task force, and with the Drug Enforcement Administration's ("DEA") Task Force. (Tr. p. 4). He was working on the DEA task force during the time of the events that occurred in this case. (Tr. p. 4).

On August 26 or 27, 2004[2], Sergeant Masiero received information that two individuals had fled from a vehicle. (Tr. p. 4-5). A search warrant was secured for this vehicle, and on August 27, 2004, a search was conducted of the vehicle and 900 grams of cocaine were seized from the vehicle. (Tr. p. 5). From this occurrence, a cooperating informant was developed. (Tr. p. 5). The confidential informant told Sergeant Masiero that the source of supply for this cocaine was Antonio Payne, a co-defendant in the instant case. (Tr. p. 6). Sergeant Masiero interviewed other confidential informants which led to the investigation of Antonio Payne. (Tr. p. 6). Sergeant Masiero obtained a pen register on February 3, 2005. (Tr. p. 6). On February 15, 2005, a confidential informant conducted a controlled purchase of cocaine from Antonio Payne. (Tr. p. 6). On March 24, 2005, Sergeant Masiero was given

---

[1] "Tr." refers to the transcript (Doc. 741) of the evidentiary hearing held on November 2, 2006.

[2] The testimony varied at to whether the year was 2004 or 2005. (See, Tr. p. 4 and 5). It appears from the overall time line of the case that 2004 was correct.

authorization for a wire tap of Antonio Payne's cellular telephone, and on March 29, 2005, Sergeant Masiero began to intercept communications involving this cellular telephone. (Tr. p. 7). A surveillance of Antonio Payne was initiated. (Tr. p. 8).

On March 31, 2005 and April 1, 2005, Sergeant Masiero intercepted communications between Antonio Payne and others including an individual who was later identified as Erick Perry. (Tr. p. 9). The telephone calls were given numbers, and call numbers 519 and 676 were calls that had information pertinent to Sergeant Masiero's investigation. (Tr. p. 9-10, 12). Other telephone calls made on these two days with the numbers 549, 569, and 614, did not involve the Defendant, however, these calls were also pertinent to the investigation. (See, Gov. Exh. 1, a compact disk of the calls, and Gov. Exh. 2, a transcript of these calls, Tr. p. 10-12). Sergeant Masiero was able to recognize the voice of Antonio Payne on these telephone calls. (Tr. p. 13).

Call number 519 was between Antonio Payne and Eric. (Gov. Exh. 2). This call consisted of Eric[3] complaining to Antonio Payne that a certain substance "won't drink." (Gov. Exh. 2). The substance had water dripping out if it and it would not drink. (Gov. Exh. 2). Antonio responded by saying that he had tried to get this substance to drink, but he could not so he bagged it up. (Gov. Exh. 2). Eric stated that he did not need more of this stuff, but he does need a different batch of the substance. Eric also discussed how he "can cook six . . I can cook six twenty of them and make it bigger . . ." (Gov. Exh. 2). In call number 528, Antonio Payne is again speaking with Eric, and arranging a meeting with him that night. (Def. Exh. A). Call number 549 is between Antonio Payne and Tony discussing the problems with the substance. Antonio Payne tells Tony that there is something

---

[3] The identity of Eric is not germane to the issues in the Report and Recommendation, and therefore the Court does not address this issue.

wrong with the substance, he had four more of it, and he wants to return it. (Gov. Exh. 2). Antonio Payne tells Tony he is returning it on Saturday or Sunday. (Gov. Exh. 2). Tony says he had to speak to someone and he would call Antonio Payne the next day. (Gov. Exh. 2). In call number 569, Antonio Payne tells Tony that he is going to bring the "watcha-call-its" back to him. (Gov. Exh. 2). He tells Tony that he is having problems with his substance, and Tony says that he has been getting rid of it with no problems. (Gov. Exh. 2). Antonio Payne tells Tony that he is going to bring back three, and buy two more. (Gov. Exh. 2). In call number 614, Antonio calls Tony and Tony tells him that he has "some for you." (Gov. Exh. 2). Tony is going to keep the substance Antonio brings to him and resell it. (Gov. Exh. 2). Tony has something different for Antonio Payne. (Gov. Exh. 2). Antonio Payne tells Tony that he his going to bring back three items and he is going to get two more, so the total will be five. (Gov. Exh. 2). Antonio tells Tony that he will see him shortly. (Gov. Exh. 2)[4].

    Sergeant Masiero relied on his knowledge of purchasing cocaine, on the information provided by the confidential informants, and on the controlled purchase already made from Antonio Payne to determine that the subject of the intercepted telephone calls involved his investigation into illegal narcotics. (Tr. p. 19, 57-8).

    Based on these recordings, Sergeant Masiero decided to contact the Florida Highway Patrol and ask for assistance from that agency. (Tr. p. 19). Sergeant Masiero believed that these telephone calls involved a bad batch of cocaine that Antonio Payne received from his source, and Antonio Payne's plan was to take back three bad kilograms of cocaine from the five kilograms that he originally purchased, and purchase an additional two kilograms. (Tr. p. 19). He would be returning to the Fort Myers area with five kilograms of cocaine. (Tr. p. 19). Sergeant Masiero determined from listening

---

[4] Call number 614 occurred on April 1, 2005, the date of the stop.

to these telephone calls that Antonio Payne would be traveling from Fort Myers to the Miami area carrying three kilograms of cocaine and a large amount of cash. (T.p. 19, 25).

Sergeant Masiero placed surveillance on Antonio Payne and followed him from the Fort Myers area through Immokalee to Route 29 and then to Alligator Alley. (Tr. p. 19). While following Antonio Payne, Sergeant Masiero was in constant contact with Sergeant Hinton from the Florida Highway Patrol. (Tr. p. 19). Sergeant Masiero's objective was to have Antonio Payne stopped either by using the wire tap evidence as probable cause or for a traffic infraction. (Tr. p. 19). He continue to be in contact with the Florida Highway Patrol. (Tr. p. 20). As he followed the vehicle, he relayed to Sergeant Hinton that the vehicle was traveling in excess of 80 miles per hour. (Tr. p. 21). At that point, Highway Patrol Officers stopped the vehicle. (Tr. p. 21).

A major concern for Sergeant Masiero was that the on-going investigation not be revealed to Antonio Payne so that the investigation could continue and the main source of supply be identified. (Tr. p. 21). At the traffic stop, three kilograms of cocaine and $40,000 in cash were seized. (Tr. p. 22). Sergeant Masiero determined that the officers should create a ruse, which was to seize the cocaine and cash, tell the Defendants that the cocaine did not test positive, and release Antonio Payne and the other passenger who was identified as Erick Perry. (Tr. p. 22-3). After Antonio Payne and the Defendant were released, they went to a nearby rest stop where Sergeant Masiero happened to be stopped. (Tr. p. 23-4). He saw both of the men exit their vehicle and he could identify them. (Tr. p. 23-4).

On cross-examination, defense counsel asked if any of the code words that were developed in this case were used during the conversations that were intercepted. (Tr. p. 26). Some of the code words were "long sleeve" for an ounce of cocaine, "short sleeve" for a half an ounce of cocaine, a "full circle" for a whole crack cookie, and a "half circle" for a half of a crack cookie. (Tr. p. 27). None of

these code words were used in the intercepted transmissions. (Tr. p. 27). Nor did the conversations use the word cocaine. (Tr. p. 27). Sergeant Masiero testified that based upon his investigation and his experience he knew that the conversations were related to converting cocaine into crack cocaine. (Tr. p. 28). Both Antonio Payne and Erick Perry denied having any knowledge that cocaine and cash were in the vehicle. (Tr. p. 29). Sergeant Masiero testified that the car was stopped at approximately 19:08 and Antonio Payne and the Defendant were released at 20:07. (Tr. p. 49, 51).

### B. Testimony of Trooper Gideons

Trooper Gideons has been employed with the Florida Highway Patrol for approximately ten years as a state trooper. (Tr. p. 62). On April 1, 2005, Trooper Gideons participated in a traffic stop of a 1993 Lexus. (Tr. p. 62). He was given information from Sergeant Daniel Hinton that this vehicle probably had narcotics in it. (Tr. p. 63). Sergeant Hinton asked him to make a traffic stop of the vehicle. (Tr. p. 63). He made a traffic infraction stop with probable cause. (Tr. p. 63). The stop was for unlawful speeding. (Tr. p. 63). He pace clocked the vehicle by following a short distance behind the vehicle and then running the same speed as the vehicle for a mile or mile and a half. (Tr. p. 63-5). He determined that the Lexus was traveling at a rate of speed of 85 m.p.h. and the posted speed limit was 70 m.p.h. (Tr. p. 65). The stop was conducted at approximately 7:10 p.m. (Tr. p. 66). Trooper Gideons issued a warning. (Tr. p. 66). He decided to issue a warning because on Alligator Alley traveling at a speed of 85 m.p.h. is the borderline between receiving a warning and receiving a citation. (Tr. p. 66).

Trooper Michael Grider was the first officer to arrive on the scene. (Tr. p. 67). Trooper Grider arrived when the driver of the Lexus had exited his vehicle and had just reached the front door of

Trooper Gideons patrol vehicle. (Tr. p. 67). Sergeant Daniel Hinton was the next officer to arrive and he arrived a few minutes after Trooper Grider. (Tr. p. 67). Trooper Gideons identified the driver of the vehicle as Antonio Payne. (Tr. p. 67). Trooper Grider asked the passenger to exit the vehicle, and when Sergeant Hinton arrived he had his drug detection dog perform a free-air sniff. (Tr. p. 67).

### C. Testimony of Sergeant Hinton

Sergeant Hinton has been employed by the Florida Highway Patrol for twenty years. (Tr. p. 93). He is a supervisor, K-9 handler, K-9 coordinator, K-9 trainer, and contraband interception regional coordinator. (Tr. p. 93). He has been training with dogs since 1990, and became a dog handler in 1994, and a trainer in 1997. (Tr. p. 93-4). He and his dogs are trained to find people in buildings, as well as locate narcotics. (Tr. p. 94). The dogs are trained to detect the odor of narcotics. (Tr. p. 94).

On April 1, 2005, Sergeant Masiero contacted him and asked if he or his subordinates would be available to assist in an investigation concerning wire tap intercepts. (Tr. p. 94-5). Based upon these intercepts, there was information that an individual would be transporting illegal drugs from Fort Myers to Miami. (Tr. p. 95). Sergeant Hinton's responsibility was to oversee the operation of conducting a traffic stop and to use a K-9 if necessary. (Tr. p. 95). His directive was to attempt to develop probable cause to conduct the traffic stop so that the investigation would be protected. (Tr. p. 95). He was not told to conduct a traffic stop in the absence of a traffic infraction. (Tr. p. 95). Sergeant Masiero told him that the driver of the vehicle was taking three kilograms of cocaine back to the Miami area due to the poor quality of the cocaine. (Tr. p. 96).

Sergeant Hinton was in constant contact with Sergeant Masiero. (Tr. p. 96). He knew that Sergeant Masiero had established a surveillance of the vehicle, and that the vehicle was traveling on State Road 82 to State Road 29 heading towards Miami. (Tr. p. 96-7). Based upon this information, Sergeant Hinton placed Trooper Gideons on Alligator Alley, in an area that Sergeant Hinton assumed the vehicle would pass. (Tr. p. 97). He proceeded to Alligator Alley as well. (Tr. p. 97). The traffic stop occurred at Mile Marker 70. (Tr. p. 97). He arrived at the scene of the traffic stop within five minutes of the stop being conducted. (Tr. p. 98).

When he arrived at the stop, Sergeant Hinton saw Trooper Gideons talking to the driver of the vehicle, Antonio Payne. (Tr. p. 98). Trooper Grider had the front seat passenger, Erick Perry out of the vehicle as well. (Tr. p. 98). Trooper Gideons was in the process of writing the warning. (Tr. p. 98). Immediately upon arriving at the stop, Sergeant Hinton had his dog, Ranger conduct a free-air sniff of the exterior of the Lexus. (Tr. p. 98). He deployed Ranger to detect the odor of illegal drugs starting at the right front headlight of the Lexus and working counterclockwise around the vehicle. (Tr. p. 99-100, 104). Ranger alerted by excessive scratching to the odor of narcotics on the driver's door, specifically to the driver's door handle. (Tr. p. 104, 118). After Ranger alerted, Sergeant Hinton put him back in his vehicle and asked Antonio Payne and the Defendant why the dog alerted on the car. (Tr. p. 106). Neither responded, and Sergeant Hinton returned to his vehicle, got the dog and conducted a search of the vehicle. (Tr. p. 106, 107). Antonio Payne and the Defendant did not

consent to a search of the vehicle.[5] (Tr. p. 129).   He found a backpack with three large ziplock bags containing a white powdery substance and seven bundles of currency. (Tr. p. 107).

Sergeant Hinton obtained Ranger in 2003 and Ranger was certified to detect the odor of narcotics including cocaine at the time of the stop. (Tr. p. 99). Ranger underwent approximately 800 hours of training. (Tr. p. 99). Sergeant Hinton received Ranger from the Sarasota County Sheriff's Office. (Tr. p. 99). Ranger had received training there as well as with Sergeant Hinton. (Tr. p. 99). Sergeant Hinton testified that to receive certification, a dog must be 90% accurate. (Tr. p. 101).

After locating the narcotics, Sergeant Hinton conducted a post-*Miranda* interview with both Antonio Payne and the Defendant. (Tr. p. 108).   He read both Antonio Payne and the Defendant their *Miranda* rights. (Tr. p. 108, 129).   The Defendants denied knowledge of the cocaine. (Tr. p. 108). Eventually, Antonio Payne and the Defendant were released so that the investigation would continue. (Tr. p. 109).

**II. Analysis**

The Defendant argues that the stop of the vehicle was unlawful, the search of the vehicle was unlawful, and the evidence seized and the statements made should be suppressed. The Government argues that the traffic stop was lawful based upon a traffic infraction or in the alternative, based upon articulable suspicion that criminal activity was occurring.  Further, the Government asserts that the search of the vehicle after the dog alerted to the presence of the odor of illegal narcotics was valid.

---

[5] Although Sergeant Hinton testified that no consent to search was given, the DEA 6 states that "[a] consent search was also obtained from PAYNE to search the vehicle." (Def. Exh. B, p. 1). For the purposes of this Report and Recommendation, the Court will base its analysis on the premise that no consent to search was given.

### A. Traffic Stop

The Fourth Amendment provides protections to individuals from unreasonable searches and seizures by government officials, and this protection extends to investigatory stops of people or vehicles. *United States v. Johnson*, 2006 WL 2337741, *2 (11th Cir. 2006), (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). A stop of an automobile by police, even if only for a brief period of time and for a limited purpose constitutes a "seizure" of "persons" within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-810 (1996), citations omitted. A traffic stop must not be "unreasonable" under the circumstances. *Id*. at 810. A decision to stop a vehicle is reasonable when the officer has probable cause to believe a traffic violation occurred. *Id*.

In the instant case, Sergeant Masiero followed the Lexus and noted that it was traveling at a rate that exceeded the speed limit. Sergeant Masiero notified Sergeant Hinton that the Lexus was speeding. Trooper Gideons followed the Lexus for approximately one to one and a half miles and pace clocked the rate of speed of the Lexus at 85 m.p.h. which exceeded the speed limit by 15 m.p.h. Pursuant to Florida law, it is unlawful to "drive a vehicle on a highway at a speed greater than is reasonable and prudent under the conditions and having regard to the actual and potential hazards then existing." Fla. Stat. §316.183(1). Trooper Gideons observed the driver of the Lexus committing a traffic infraction, pace clocked the Lexus to verify the speed it was traveling, and determined that probable cause existed to stop the vehicle.

The Defendant argues that the stop of the Lexus for a traffic violation was actually just a pretext to stop the vehicle to search for illegal drugs. "It is well-settled that an officer's subjective motivations do not affect whether probable cause existed." *Miller v. Harget*, 458 F.3d 1251, 1260 (11th Cir. 2006) (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)). Ulterior motives of an

officer will not invalidate police conduct which is based upon probable cause to believe that a violation of the law occurred. *Draper v. Reynolds*, 369 F.3d 1270, 1275 (11th Cir. 2004) (citing *Whren v. United States*, 517 U.S. 806, 812-813 (1996)). The Defendant argues that the case of *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000) resurrected the argument that a court may consider the motivations of an officer. The *Edmond* case involves the policy of the Indianapolis police department in conducting vehicle checkpoints to stop unlawful drugs. *Id*. at 34-35. Officers were directed to stop a predetermined number of vehicles. *Id*. at 35. An officer approached the vehicle and advised the driver that he was stopped at a drug checkpoint, and then asked for the driver's license and registration. *Id*. The officer looked for any signs that the driver was impaired and conducted an open-view examination of the vehicle while a free-air sniff was conducted by a trained dog. *Id*. The Supreme Court distinguished cases where stops were conducted in the absence of probable cause from the *Whren* case which held "that an individual officer's subjective intentions are irrelevant to the Fourth Amendment validity of a traffic stop that is justified objectively by probable cause to believe that a traffic violation has occurred." *Id.* at 45. The facts in the instant case are similar to the *Whren* case in that the officer had probable cause to stop the Lexus based upon a traffic infraction. The Court determines that *Indianapolis v. Edmond*, *supra* does not apply under the facts of this case.

The Government's alternate theory is that the officers had reasonable articulable suspicion that criminal activity was occurring. Even if the Court had found that the officer lacked probable cause to stop the vehicle for speeding, an officer would be permitted to stop a vehicle if he had reasonable suspicion that criminal activity "'may be afoot.'" *United States v. Johnson*, 2006 WL 2337741, *2 (11th Cir. 2006), (quoting *United States v. Arvizu*, 534 U.S. 266, 273 2002)). "'Reasonable suspicion is determined from the totality of the circumstances, and from the collective knowledge of the officers

involved in the stop.'" *United States v. Davis*, 175 Fed.Appx. 286, 287 (11th Cir. 2006), (quoting *United States v. Williams,* 876 F.2d 1521, 1523 (11th Cir. 1989)). When officers are conducting an operation in a group, and the officers have a minimal amount of communication between them, then their collective knowledge is used to determine if probable cause exists. *United States v. Rodriquez*, 2006 WL 2563485, *1 (11th Cir. 2006)(citing *United States v. Wilson*, 894 F.2d 1245, 1254 (11th Cir. 1990)). "The officer 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *United States v. Davis*, 175 Fed.Appx. at 287, (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). The Court may look to objective observations, information from police reports, and an individual's proximity to illegal activity to determine if reasonable cause existed to stop the vehicle. *United States v. Davis*, 175 Fed.Appx. at 288, *United States v. Johnson,* 2006 WL 2337741 at *2.

     In the instant case, in August 2004, Sergeant Masiero received information concerning illegal drugs found in a vehicle, and a confidential informant provided the information that the source of these drugs was Antonio Payne. Other confidential informants provided information concerning the illegal drug activities of Antonio Payne, and Sergeant Masiero began his investigation of Antonio Payne based upon this information. Sergeant Masiero obtained a wire tap for Antonio Payne's cellular telephone and monitored the telephone calls that Antonio Payne made and received. He was able to identify Antonio Payne's voice. Based upon Sergeant Masiero's experience he knew that the telephone calls presented at the evidentiary hearing involved transactions concerning illegal drugs. He knew that the the telephone calls between Antonio Payne and Eric were concerning the inability of Eric to cook the cocaine to make crack cocaine and that it was a bad batch of cocaine. Sergeant Masiero also knew that the calls between Antonio Payne and Tony were to arrange to exchange three kilograms of the bad

batch of cocaine and purchase two more kilograms of cocaine. Sergeant Masiero determined from the intercepted conversations that Antonio Payne would be traveling to Miami to conduct this transaction. He then began his surveillance of Antonio Payne which confirmed the substance of the telephone calls that Antonio Payne was planning to return to Miami to transact his business. Sergeant Masiero than contacted the Florida Highway Patrol to assist him in stopping the vehicle.

Sergeant Masiero contacted Sergeant Hinton telling him that he had information that certain individuals in a Lexus were transporting illegal drugs from Fort Myers to Miami. Some of the knowledge that Sergeant Masiero had concerning the transportation of illegal drugs and cash was passed on to Sergeant Hinton who in turn informed Trooper Gideons that a Lexus was transporting illegal narcotics and contained a large amount of cash. Based upon the totality of the circumstances and the collective knowledge of the officers, the Court determines that the officers had a reasonable suspicion that criminal activity was occurring and would have been permitted to stop the vehicle on that basis.

### B. Search of the Vehicle

The Defendant argues that a trained dog's alert on the door handle of a vehicle is not sufficient to constitute probable cause to search the vehicle. The Government asserts that the dog alerted properly on the vehicle, and that the officers had probable cause to search the vehicle based upon the dog's positive alert for the odor of illegal substances. The Supreme Court has held that there is no legitimate interest in possessing contraband, and a governmental search that "only reveals the possession of contraband 'comprises no legitimate privacy interest.'" *Illinois v. Caballes*, 543 U.S. 405, 408-9 (2005) (quoting *United States v. Jacobsen*, 466 U.S. 109, 124 (1984)). "A canine sniff

during a lawful detention does not constitute a search. *Illinois v. Caballes*, 543 U.S. 405, 408-9 (2005). Once a trained canine gives a positive alert to a vehicle, probable cause exists to make [a] search [of] that vehicle." *United States v. Williams*, 2006 WL 2817541, *5 (11th Cir. 2006) (citing *United States v. Glinton*, 154 F.3d 1245, 1257 (11th Cir. 1998)). The Defendant failed to cite and the Court could find no cases which differentiated a positive alert on a door handle as compared to another location on a vehicle. The case law holds that if a trained drug detection dog alerts on a vehicle, there is probable cause to search the vehicle. In this case, the dog alerted on the door handle of the vehicle indicating that there was the odor of an illegal substance there. The positive alert by the dog gave the officers probable cause to search the vehicle. The Defendant did not introduce any evidence that the specific dog, Ranger, was not reliable. His handler, Sergeant Hinton testified to the extensive number of hours that this dog was trained.[6]

The Court determines that the free-air sniff conducted by the well-trained drug detection dog was lawful, and provided probable cause for the search of the vehicle. The Court also determines that the search of the vehicle was lawful, and the subsequent seizure of cocaine and cash was lawful and any statements which were made in conjunction with the search or seizure of the evidence should not be suppressed. The Court recommends that the Motion to Suppress Physical Evidence and Statements of the Defendant be denied.

---

[6] Although the Eleventh Circuit has not discussed the issue of a drug dog's reliability extensively, it did state that "[t]wo other circuits have held that training of a dog alone is sufficient proof of reliability. *United States v. Venema*, 563 F.2d 1003, 1005 (10th Cir. 1977); *United States v. Meyer*, 536 F.2d 963, 965-66 (1st Cir. 1976). We endorse the views of those circuits." *United States v. Sentovich*, 677 F.2d 834, 837, n.8 (11th Cir. 1982).

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Respectfully recommended in Chambers in Ft. Myers, Florida this  13th   day of November, 2006.

_____
DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

Copies:

All Parties of Record